## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ANN MCKINLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-02548-TWP-DLP |
| | ) | |
| UNITED PARCEL SERVICE INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendant United Parcel Service Inc. ("UPS") (Filing No. 52). Plaintiff Ann McKinley ("McKinley") filed this lawsuit asserting claims for gender discrimination and harassment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and wage discrimination based on sex in violation of the Equal Pay Act of 1963 (the "EPA") (Filing No. 1). For the following reasons UPS's motion is **granted**.

## I.      BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to McKinley as the non-moving party. See *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).

McKinley has been continually employed by UPS Indiana since 1984 (Filing No. 56-3 at 5). After sixteen years in the dispatch unit, she was transferred to the Control Tower as a Day Sort Flow Controller ("Flow Controller"). *Id.* at 8. For both the dispatch unit and following her transition to the Control Tower, McKinley was designated as a "Part-Time Supervisor." *Id*. at 12.

Her duties as a Flow Controller consisted primarily of managing the "loads [that] come onto the lot" and directing them to the "specific doors where they were to get unloaded" while minimizing any disruptions or "jams." *Id.* at 8. McKinley worked in the Control Tower for nineteen years (Filing No. 51-1 at 38). She then transitioned to a Scheduler position in 2019, rotating between UPS's facilities in Indianapolis ("81st Street Facility") and Plainfield ("Plainfield Facility"). *Id.* at 8–9.

At the 81st Street Facility, packages are sorted for distribution on three shifts (Filing No. 51-2 at 3). The shifts are referred to as the Day Sort, the Twilight Sort, and the Night Sort. *Id.* The Day Sort typically begins at 11:00 a.m. and ends at 4:00 p.m., the Night Sort generally lasts from 11:00 p.m. to 3:00 a.m., and the Twilight Sort typically lasts from 5:00 p.m. or 5:30 p.m. to 9:30 p.m. or 10:45 p.m. *Id.* With respect to the volume received during these sorts, "everything depend[ed] on the volume and the volume is constantly going up and down." (Filing No. 51-1 at 23.) Historically, the Day Sort "handled a smaller volume of work than the other sorts. Because there is a much lower volume (or flow) of packages … to process, and fewer employees to supervise." (Filing No. 51-2 at 3.)

Of the six non-union employees in the Control Tower while McKinley worked there, she was the only female employee and was the only employee who was not designated a "Specialist." UPS did employ a female Specialist in the safety department, but when McKinley inquired as to why she was not made a Specialist, UPS's "answers always changed". *Id.* at 55. During her time in the Control Tower, McKinley questioned managers about why she was not yet made a Specialist like her other male colleagues. *Id.* at 56. She was repeatedly told that she could be replaced in the Control Tower with a male Specialist. *Id.*

McKinley's designation as a Part-Time Supervisor meant she was ineligible for raises that were as high those of the Specialists (*see generally* Filing No. 56-14).  As a Part-Time Supervisor, she had lower vacation pay, less pension, and less access to overtime than Specialists (Filing No. 56-4 at 8, 10, 20).  In 2017, McKinley's colleague, Cory Wells ("Wells"), was promoted from Part-Time Supervisor to Specialist when McKinley had at least twenty-eight years of seniority over him (Filing No. 56-14 at 37). That same year, she was approached by her manager and asked about her interest in becoming a Specialist at the Plainfield Facility (Filing No. 56-3 at 19). McKinley rejected this offer and reiterated her interest in becoming a Specialist at the 81st Street Facility. *Id*.; Filing No. 51-1 at 66.

Throughout her time at UPS, McKinley has experienced "daily harassment, intimidation, and belittling" on account of her sex (Filing No. 51-1 at 123). As early as 1994, she was told by a former manager in the dispatch unit that she was not promoted within that unit because she had become pregnant and "chose a family over a career."  *Id.* at 134.  The Control Tower was often referred to as the "boy's club" which felt belittling to McKinley as a female. (Filing No. 56-4 at 11.) Generally, the maximum number of people in the Control Tower was limited to three, however the site would often serve as an informal gathering place for other employees to congregate (Filing No. 51-1 at 28-29). McKinley found this "unnerving" and over the years she would ask employees and managers above her to leave "because they were being too loud and they were safety hazards." *Id.* at 29, 30.

In late 2013, McKinley went to the Human Resources department ("HR") Manager, Peter Hood ("Hood") to address the issue of not being a Full-Time Specialist while two other male colleagues who performed the same role, according to McKinley, were full-time (Filing No. 51-9 at 1). Following minor confusion about the scheduling of this meeting, McKinley called Hood and

provided clarification only to be told by Hood that she was a "typical female who didn't listen." *Id.;* Filing No. 56-3 at 25.  McKinley reported this incident to the UPS Help Line along with her concern about not being full-time (Filing No. 51-9 at 1–7).  Following an investigation, UPS determined the allegation of the derogatory comment towards McKinley "could not be substantiated." *Id.* at 2.  Regarding her complaint about not being full-time, UPS investigators spoke with the Division Manager, Ken Seader ("Seader"), who had the authority to change McKinley's designation and was told that "it is not in his plan/budget to have a full-time person added to his staff." *Id.*

McKinley made another complaint to the UPS Help Line in 2014 regarding unprofessional conduct by Seader and her pay rate.  *Id.* at 8.  She reported that since at least 2012 Seader would intimidate her by screaming and yelling at her.  *Id.*  This behavior culminated in Seader accidentally striking McKinley with a radio, which Seader threw in anger.  *Id.*  UPS investigators found the allegations against Seader were substantiated and documented that UPS would monitor Seader's behavior as part of the resolution of McKinley's complaint.  *Id.* at 13.  Concerning her pay rate, UPS documented that along with "information regarding the promotion process to Specialist," there was a "candid discussion with McKinley [which] took place regarding the pay band structure and subsequent increases." *Id.* at 9.

In late 2018, McKinley made a third complaint to the UPS Help Line regarding an incident that occurred during the Memorial Day holiday (Filing No. 51-1 at 99-100).  McKinley wanted to work in flow control that day because of the overtime opportunity provided by the holiday and she was "the senior person" on the shift.  *Id.* at 100.  She was told by the manager in charge, Chuck Crane ("Crane"), that she could not work the holiday shift and was denied the overtime opportunity.  *Id.*  McKinley went to HR to address what she perceived as a lack of consistency

with how the holiday shifts were assigned and subsequently felt as though she was discouraged to use the UPS Help Line (Filing No. 51-9 at 17). UPS investigated McKinley's claims and found that they could not be substantiated. *Id*. However, the management team responsible for the holiday assignments was coached to be more consistent. *Id*. McKinley and Crane had a "not-so-great history" between them. (Filing No. 51-1 at 100.) McKinley could not definitively state that her gender was the basis for Crane's behavior towards her as opposed to an antagonistic attitude not related to her sex. *Id*. at 106.

McKinley experienced constant comments made about her body and her chest size "almost every week." (Filing No. 56-4 at 12.) Her male coworkers would make derogatory comments couched as jokes that would often make her uncomfortable. *Id*. Other incidences of improper conduct included a feeder driver coming into McKinley's office and kissing her "out of the blue." *Id*. at 13. In another inappropriate incident in 2015, a manager approached McKinley at a retirement party and grabbed her rear end without her consent. *Id*. As recently as 2018 and 2019, she was being greeted repeatedly with "Hey girl," by a manager which she felt was indicative of a lack of respect and unfair treatment based on her gender. *Id*. at 11. However, McKinley did not report these incidences to the UPS Help Line. *Id*. at 13.

In March 2018, McKinley was promoted to a Specialist on the Day Sort at the 81st Street Facility (Filing No. 56-3 at 12). She experienced no change in her duties or work hours. *Id*. While her pay increased with the promotion (*see* Filing No. 56-14 at 30, 32), she still earned less than other male coworkers who were Specialists and who started their employment with UPS between two years and fifteen years after McKinley did, though they were promoted to Specialist earlier. *Id*. at 9–20; 28–34.

On August 24, 2018, McKinley filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination, harassment, and denial of equal pay (Filing No. 56-10 at 1). UPS provided their position statement in response on March 18, 2019 (Filing No. 56-13). Following McKinley's EEOC Charge, her annual performance evaluation rating was downgraded from the highest possible rating (Filing No. 56-6 at 7). McKinley was the only Specialist to have her rating downgraded and she alleges that she received a smaller raise because of the change (Filing No. 56-3 at 14).

On June 24, 2019, McKinley filed the instant Complaint against UPS alleging gender discrimination and harassment in violation of Title VII and wage discrimination based on sex in violation of the EPA (Filing No. 1). UPS moved for summary judgment on February 26, 2021 (Filing No. 52).

## II.   <u>LEGAL STANDARD</u>

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir.

2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted). Employment discrimination cases are "extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." *Greer v. Bd. of Educ. of City of Chicago, Ill.*, 267 F.3d 723, 727 (7th Cir. 2001) (citation and quotation marks omitted).

### III.   DISCUSSION

In Count I of her Complaint, McKinley alleges that UPS engaged in unlawful sex discrimination and harassment in violation of Title VII when it "failed to promote [her]" and "subjected [her] to severe and pervasive harassment, differential treatment, and a hostile work environment" on account of her sex (Filing No. 1 at 4–5). In Count II, McKinley alleges she

performed work that was substantially equal to the work performed by male employees under the same conditions, yet these male employees were paid more in violation of the EPA. *Id*. at 5.

UPS seeks summary judgment on McKinley's claims asserting (1) her claims are time-barred because they "originate from an alleged failure to promote" in 2013; (2) she "cannot establish she was actually rejected for the position for any period of time that would arguably fall within the applicable statute of limitations window"; (3) she was at all times compensated according to the pay band for the position she held; and (4) she cannot "establish she was subjected to actionable harassment in violation of Title VII." (Filing No. 53 at 1, 2.) Before addressing the specific assertions, the Court will first address UPS's contention that McKinley has failed to comply with the local rules of this Court (Filing No. 62 at 2).

## A.    <u>Local Rule 56-1</u>

The Southern District of Indiana's Local Rule 56-1 requires that a party moving for summary judgment include a section in their papers labeled "Statement of Material Facts Not in Dispute." *See* S.D. Ind. Local R. 56-1. The non-movant opposing summary judgment must then respond with a "Statement of Material Facts in Dispute" that "identifies the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment." *Id*. The rule requires that all material facts asserted be supported by specific citations. *Id*. The Court accepts the moving party's facts as admitted unless the non-movant specifically controverts those facts in its factual statement, shows them to be unsupported, or demonstrates that reasonable inferences can be drawn in its favor. *Id.*

Local Rule 56-1 is clear that a party must support each fact the party asserts in a brief "with a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." *Id*. It is the obligation of the parties to support their material facts with specific citations, and the Court

"has no duty to search or consider any part of the record not specifically cited in [the] manner" described in subdivision (e) of Local Rule 56-1. *Id*. UPS argues that McKinley has failed to comply with Local Rule 56-1 because her "Statement of Material Facts in Dispute" is a list of twenty-one queries not supported by citations save for four (*see* Filing No. 57 at 16–18, ¶¶ 3, 4, 7, 14). UPS contends that McKinley's "Statement of Material Facts Omitted by UPS" are additional facts she believes the Court should consider but are not disputed facts (Filing No. 62 at 3). UPS asks the Court to disregard McKinley's "Statement of Material Facts in Dispute" and "deem the supported factual statements in UPS's Statement of Material Facts Not in Dispute as undisputed." *Id.* at 4.

UPS is correct that McKinley's "Statement of Material Facts in Dispute" does not comply with Local Rule 56-1. *See Hinterberger v. City of Indianapolis*, 966 F.3d 523, 528 (7th Cir. 2020) ("[R]ecognition that district courts may require strict compliance with their local rules—a point [the Seventh Circuit has] recognized time and again."); *Boss v. Castro*, 816 F.3d 910, 914 (7th Cir. 2016) ("The district court's discretion to require strict compliance with Local Rule 56.1 has been upheld time and again.") (citations omitted). Failure to comply with Local Rule 56-1 is not a "harmless technicality" but a mistake that Seventh Circuit precedent has "deemed fatal." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 924 (7th Cir. 1994) ("[T]here is nothing improper in the court enforcing the rule strictly[.]").

The briefing and designated evidence in this case is lengthy, and the Courts limited time does not allow it to search through the record to find the material facts that McKinley asserts are in dispute. Accordingly, the Court will strike McKinley's "Statement of Material Facts in Dispute" as non-compliant with the Court's local rules except for paragraphs three, four, seven, and fourteen which are supported by specific citations (Filing No. 57 at 16–18, ¶¶ 3, 4, 7, 14). The Court will deem UPS's "Statements of Material Facts Not in Dispute" as admitted and undisputed except for

Section II (A) and Section II (D)(2) of its summary judgment brief (Filing No. 53 at 2, 8); *see also McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 787 (7th Cir. 2019) ("In light of [plaintiff's] widespread noncompliance [of local rule], the judge deemed the defendants' factual submissions admitted."). Because the Court reviews the record in a light most favorable to McKinley it will consider McKinley's "Statement of Material Facts Omitted by UPS" to the extent it is "competently supported by admissible evidence." *See Arevalo-Carrasco v. Middleby Corp., Inc*., 851 F. App'x 628, 629 (7th Cir. 2021) (holding that the district court was entitled to strictly enforce its local rules).

**B.** **Title VII Discrimination Claim**

UPS asserts it is entitled to summary judgment on McKinley's claim that she "should have been promoted in 2013 to a Full-Time Supervisor on the day sort" because this is a failure to promote claim that is time-barred because it occurred at least four years prior to the 300th day before she filed her EEOC Charge (Filing No. 53 at 11). *See also Moore v. Vital Prods., Inc.*, 641 F.3d 253, 256 (7th Cir. 2011) ("Any complaint of conduct that occurred more than 300 days before the relevant EEOC charge is time-barred."). McKinley filed her EEOC Charge on August 24, 2018 (*see* Filing No. 56-10 at 1) making October 28, 2017 the 300th day prior to the charge (Filing No. 53 at 11). UPS notes that an "employer's alleged failure to promote is considered a 'discrete act' for purposes of Title VII." *Id*. (internal citations omitted). If the discrete act occurred more than 300 days before an employee filed a charge of discrimination, a "claim based on the discrete act is time barred, even if it is 'related to acts alleged in timely filed charges.'" *Id*. (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)). And even if McKinley's claims are not considered time-barred, UPS contends it is entitled to summary judgment on her failure to

promote claim because McKinley cannot establish that UPS failed to promote her in the 300-day period prior to the date she filed her charge of discrimination (Filing No. 53 at 12).

To demonstrate a *prima facie* case for failure to promote, a plaintiff "must produce evidence showing that (1) she was a member of a protected class; (2) she was qualified for the position sought; (3) she was rejected for the position; and (4) the employer promoted someone outside of the protected class who was not better qualified for the position." *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 892 (7th Cir. 2016) (internal citations and quotation marks omitted).

UPS contends that McKinley cannot establish the third prong of the inquiry because in the period between October 24, 2017 and August 28, 2018, it filled two Full-Time Specialist positions on the day sort shift—at the Plainfield Facility and the 81st Street Facility—and both positions were offered to McKinley before she ultimately accepted a Specialist position at the 81st Street Facility (Filing No. 53 at 12). Only *after* McKinley rejected the offer to be a Specialist at the Plainfield Facility did UPS transfer Chris Bryant ("Bryant") to a Full-Time Specialist position there. *Id.* Thus, UPS argues, McKinley has "failed an essential element of her failure to promote claim." *Id.* at 13.

McKinley responds that she has presented sufficient evidence from which a reasonable jury could find in her favor on her claims under Title VII (Filing No. 57 at 24). She argues that her Title VII claims are timely because she "suffered differential treatment, differential classification, differential pay, discriminatory paychecks, and harassment on the basis of sex within the 300-day period prior to [McKinley's] August 24, 2018 EEOC Charge." *Id.* McKinley asserts that she was within the applicable period when she "complained that she was not considered a Specialist even though she was doing the Specialist job." *Id.* at 25. She made several similar complaints between October 28, 2017 and August 24, 2018, and during this time she endured daily harassment in the

Control Tower and received discriminatory paychecks. *Id*. McKinley maintains that she may "use evidence from her entire period of employment at UPS to support her timely claims." *Id*. (citing *Kellogg v. Ball State Univ.*, 984 F.3d 525, 529 (7th Cir. 2021), *reh'g denied* (Jan. 28, 2021) (holding that when a plaintiff timely alleges a discrete discriminatory act, acts outside of the statutory time frame may be used to support that claim) (internal citations and quotation marks omitted). When taken as a whole, the evidence would permit a reasonable jury to infer an overall likelihood of discrimination (Filing No. 57 at 26); *see Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764–65 (7th Cir. 2016). McKinley notes that in determining intentional discrimination in employment on the basis of sex under Title VII, a plaintiff may provide direct or circumstantial evidence. *See Joll v. Valparaiso Community Schools*, 953 F.3d 923, 929 (7th Cir. 2020). The Seventh Circuit has "identified three broad types of circumstantial evidence that will support an inference of intentional discrimination: ambiguous or suggestive comments or conduct; better treatment of people similarly situated outside the protected class; and dishonest employer justifications for disparate treatment." *Id.* at 929 (citing *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). McKinley posits that a reasonable jury could find she was not "classified as a Specialist, subjected to differential treatment, received discriminatory paychecks, and was subjected to workplace harassment all because of her sex." (Filing No. 57 at 26.)

McKinley asserts that both Brock Evans ("Evans") and Steven Markus ("Markus") are similarly situated employees. *Id*. at 28; *see Rodgers v. White*, 657 F.3d. 511, 517 (7th Cir. 2011) ("The similarly situated analysis requires a flexible, common-sense inquiry that asks 'whether the employees situations are similar enough to the plaintiff's that it is reasonable to infer, in the absence of some other explanation, that the differential treatment was a result of [sex] or some other unlawful basis."). They are similarly situated because McKinley, Evans, and Markus performed

the same functions under similar conditions yet she received less pay in what amounts to pay discrimination on account of her sex. *Id.* Thus, a reasonable jury evaluating the totality of the evidence presented concerning her "differential treatment" could find that UPS "violated Title VII through its differential treatment" of McKinley "as a female employee." *Id.* at 29.

As argued by UPS in their reply, McKinley has failed to address the argument that her "failure to promote" claims under Title VII and the EPA are barred by the applicable statute of limitations and "fail as a matter of law." (Filing No. 62 at 4.) By neglecting to address this argument and "ignor[ing] this Court's jurisprudence on the discrete nature of promotional decisions and the resulting impact on timeliness," McKinley has waived "any argument that her Title VII and EPA discrimination claims are timely and should survive summary judgment." *Id.* at 4–5; *see Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.").

UPS maintains that as a matter of law under Title VII, McKinley was required to file her charge of discrimination with the EEOC within 300 days of the conduct underlying the claim. *See* 42 U.S.C. § 2000e-5(e)(1)). UPS asserts that the conduct in question was UPS's discrete act of failing to promote McKinley in 2013, which is time-barred (Filing No. 62 at 5). And even if the claim were not time-barred, McKinley's gender discrimination claims fail because UPS paid McKinley based on the position she held and the corresponding pay bands. *Id.* at 8. McKinley provided no evidence that UPS paid other potential comparators "outside of the pay bands for the position the individual held." *Id.* UPS maintains that McKinley has provided no evidence to contest the honesty of UPS's stated reasoning for paying her less than the male Specialists because everyone was being paid "according to their pay band." *Id.*

UPS also denies that Markus and Evans are similarly situated employees and there are "substantive differences" precluding Markus and Evans being compared to McKinley. *Id* at 10. The favorable treatment alleged by McKinley is Evans and Markus being promoted to Specialist and not her. *Id.* Because Markus was promoted to Specialist in 1999 and Evans was made a Specialist in 2004, these decisions are the "discrete actionable acts of alleged discrimination" that McKinley *could have* pursued, but because she failed to do so in a "timely fashion," UPS argues she is "now time-barred from relitigating the issue." *Id.*

The Supreme Court holds that for Title VII claims, the "critical questions" are: "What constitutes an 'unlawful employment practice' and when has that practice 'occurred?'" *Morgan*, 536 U.S. at 110. In *Morgan*, the identified two types of unlawful employment practices under Title VII: discrete acts of discrimination and hostile work environments. *Id.* The Supreme Court "held that [e]ach discrete discriminatory act starts a new clock for filing charges alleging that act" and "[d]iscrete acts such as termination, *failure to promote*, denial of transfer, or refusal to hire are easy to identify." *Adams v. City of Indianapolis*, 742 F.3d 720, 730 (7th Cir. 2014) (internal citations and quotation marks omitted) (emphasis in original).

A Title VII plaintiff who seeks relief for a series of discrete discriminatory acts cannot side-step the limitations period or its effect by arguing that the discrete acts are "plausibly or sufficiently related." 536 U.S. at 111–14. The Supreme Court has made clear that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Adams*, 742 F.3d at 730 (quoting 536 U.S. at 113).

### 1.   Failure to promote through 2018

The crux of McKinley's Title VII discrimination claim falls directly in-line with the Supreme Court's list of "discrete acts" in that McKinley is alleging a failure to promote. *See* 536

U.S. at 114.  The designated evidence shows that 2013 was the first instance of McKinley raising a failure to promote claim through the UPS Help Line (Filing No. 57 at 6).  The initial discrete act of not being promoted to Specialist occurred well before the 300-day period prior to McKinley filing the EEOC Charge.  Thus, McKinley's claims about disparate treatment, "differential classification," "differential pay," and "discriminatory paychecks" in the Title VII context, (*see generally* Filing No. 57 at 24), arise out of the 2013 failure to promote "discrete act". That the 2013 failure to promote "continues to affect [McKinley] negatively does not breathe new life into [her] claim." *Chaudhry v. Nucor Steel-Indiana*, 546 F.3d 832, 837 (7th Cir. 2008); *see also  Brown v. Ill. Dept. of Natural Resources*, 499 F.3d 675, 681 (7th Cir. 2007) (plaintiff time-barred from filing Title VII suit for any "discrete act" about which they did not file an EEOC charge within 300–day EEOC charging deadline).

The relevant case law supports the rule that for claims based on "discrete acts" of discrimination, the discrete discriminatory act "occurred" on the day that it "happened".  536 U.S. at 110; *see Barrett v. Illinois Dep't of Corr*., 803 F.3d 893, 898 (7th Cir. 2015) ("This rule applies even if an old, unchallenged discriminatory act has a present effect on an employee's status in a seniority system, a progressive discipline system, or some other dynamic employment scheme."); *see also United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977) ("A discriminatory act which is not made the basis for a timely charge ... is merely an unfortunate event in history which has no present *legal* consequences.") (emphasis added).

McKinley has presented an argument that UPS failed to promote her in 2013 after she made a complaint to the UPS Help Line (Filing No. 57 at 6).  This claim is time-barred.  The initial failure to promote in 2013 is a discrete act of discrimination that is actionable under Title VII if it had been timely raised.  *See* 803 F.3d at 898 ("[T]he Supreme Court has held that for claims based

on discrete acts of retaliation or discrimination, the discrete retaliatory or discriminatory act occurred on the day that it happened.") (quoting *Morgan*, 536 U.S. at 110) (internal citations and quotation marks omitted).  McKinley is time-barred from filing suit on any discrete act that occurred prior to October 24, 2017.  *See Brown*, 499 F.3d at 681 ("Brown filed his first EEOC charge on October 24, 2000, and thus he is time-barred from filing suit based on any "discrete act" that occurred prior to December 29, 1999.").  Much of the disparate treatment alleged by McKinley are related effects from that initial discrete act of discrimination which ultimately are not considered for the purposes of  analyzing  her failure to be promoted in 2013 claim.  *See Barett*, 803 F.3d at 898 ("[T]he 'discrete act' that starts the Title VII limitations clock is the discriminatory decision itself, not the 'consequences of the act[ ]' that may materialize down the road.") (quoting *Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980)).

It is undisputed by the parties that Bill McAdow ("McAdow") and Markus were promoted to Specialists in 1999, Evans was promoted to Specialist in 2004, Nick Bowers ("Bowers") was promoted in 2015, and Wells was promoted in March 2017 (Filing No. 57 at 9; Filing No. 62 at 6).  Even if the Court were to consider each instance of McKinley's proffered comparators being promoted to Specialist as related but distinct independently discriminatory acts, they all occur *before* October 24, 2017, meaning McKinley's failure to promote claims would still be time-barred.  *See Morgan*, 536 U.S. at 102 ("The existence of past acts and the employee's prior knowledge of their occurrence . . . does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and *charges addressing those acts are themselves timely filed*.") (emphasis added).  The Court finds that insofar as McKinley attempts to raise failure to promote claims under Title VII for the instances where her male colleagues were promoted to Specialist between 1999 and 2017 and she was not, these claims are time-barred.  *See Jones v.*

16

*Res-Care, Inc*., 613 F.3d 665, 669 (7th Cir. 2010) ("[T]he law precludes recovery for those discrete acts that occur outside the relevant statute of limitations[.]").

McKinley argues that she timely raised an actionable discrete act of discrimination under Title VII when she had a conversation with the Hub Division Manager Rick Gaffney ("Gaffney") about being designated a Specialist in February 2018 (Filing No. 51-1 at 78; Filing No. 57 at 11), also fail.  This conversation effectively renewed her failure to be promoted claim.  *See Ford v. Marion Cty. Sheriff's Off*., 942 F.3d 839, 858 (7th Cir. 2019) ("A failure to promote is a discrete act under employment discrimination laws, so each denied promotion can amount to a separate actionable unlawful employment practice.") (internal quotation marks and citation omitted). The Seventh Circuit holds "there must be 'a reasonable relationship between the allegations in the [EEOC] charge and the claims in the complaint,' and it must appear that 'the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge.'" *Vela v. Village of Sauk Village*, 218 F.3d 661, 664 (7th Cir. 2000) (quoting *Cheek v. Western and Southern Life Ins. Co*., 31 F.3d 497, 500 (7th Cir. 1994)).

Drawing all reasonable inferences in her favor as the non-moving party, the Court accepts that McKinley's February 2018 conversation with Gaffney about not being made a Specialist constitutes McKinley raising an independently discriminatory failure to promote act that is actionable under Title VII (Filing No. 57 at 13); *see SMS Demag Aktiengesellschaft v. Material Scis. Corp*., 565 F.3d 365, 369 (7th Cir. 2009) ("The non-moving party is entitled to have only reasonable inferences drawn in its favor.").  In her EEOC Charge, McKinley alleges that she complained of her "differential treatment" of not being made a Specialist on "many occasions." (Filing No. 56-10.)  This supports a reasonable relationship between the allegations in her charge

and the February 2018 claim in her Complaint and that such a claim could reasonably be expected to grow out of an EEOC investigation of the failure to promote claim in the charge.

Thus, the Court reviews McKinley's Title VII discrimination claim for failure to promote between October 24, 2017 and August 28, 2018 by examining whether she has presented direct or circumstantial evidence that UPS's promotion decisions were intentionally discriminatory or whether she is able to make an indirect case of discrimination under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

The Court disagrees with UPS's contention that McKinley has waived opposition to UPS's argument regarding her failure to promote claims under Title VII (Filing No. 62 at 4). In her response brief to the Summary Judgment Motion from UPS, McKinley defended the timeliness of her claims and disputed that they were time-barred (*see* Filing No. 57 at 19, 24–25). McKinley does not identify under which method she chooses to proceed so the Court will examine her Title VII discrimination claims under both frameworks, including considering all the evidence presented as a whole. *See Ortiz*, 834 F.3d at 765 ("Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the "direct" evidence does so, or the "indirect" evidence. Evidence is evidence.").

### 2.   Direct method

McKinley has not presented direct evidence of gender discrimination in her failure to promote claim. *See Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 824 (7th Cir.2011) ("Direct evidence is evidence that would prove discriminatory intent without reliance on inference or presumption."). As held by the Seventh Circuit: "Such evidence essentially requires an admission by the decision-maker that [the decision-maker's] actions were based upon the prohibited animus." *Harper v. Fulton Cty., Ill*., 748 F.3d 761, 765 (7th Cir. 2014). She identifies "ambiguous or

suggestive comments or conduct; better treatment of people similarly situated outside the protected class; and dishonest employer justifications for disparate treatment" as the three broad types of circumstantial evidence that can support an inference of discrimination.  *See Troupe*, 20 F.3d at 736.

The designated evidence does not support there were ambiguous or suggestive comments or conduct by UPS decision-makers to infer intentional sex discrimination in its promotion decisions.  The evidence shows that there were inappropriate comments made to and about McKinley, but these incidences were sporadic, isolated, and insufficient to support clear gender animus or sex discrimination by UPS. *See Hall v. City of Chicago*, 713 F.3d 325, 334–35 (7th Cir. 2013) ("Where a comment crosses the line from gender specific to evidencing gender animus is blurry and depends on the factual context.").

McKinley offers coworkers Markus and Evans as similarly situated to her but who received more favorable treatment (Filing No. 57 at 27–28).  She asserts that she worked in the same location as the two men, all three had similar responsibilities, and all three conducted work "primarily sitting down in front of several computer screens." *Id*. at 28; *see Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007) ("[W]e have explained that 'similarly situated' means only that members of the comparison group are comparable to the plaintiff 'in all *material* respects.'") (quoting *Crawford v. Indiana Harbor Belt R.R. Co*., 461 F.3d 844, 846 (7th Cir. 2006)) (emphasis in original). But McKinley's similarly situated comparison falls short because Markus and Evans were not similarly situated comparators and she has not demonstrated that they received better treatment. Though McKinley alleges being paid less than Markus and Evans, she provides a timeframe from before she was designated a Specialist (Filing No. 57 at 28).  She admits that UPS had pay bands that corresponded with an employee's title and pay rate (Filing No. 51-1 at 40–41).

The record shows that UPS paid McKinley at the top of the pay band for her position before she was promoted to a Specialist. *Id.*; (Filing No. 51-9 at 9). As noted by UPS, there has been no evidence presented which shows that "UPS paid [Markus], [Evans], or any other alleged comparator outside of the pay bands for the position the individual held (Filing No. 62 at 8); *see Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) ("[A] plaintiff must show that there is someone who is directly comparable to her in all material respects."). Thus.  McKinley has not shown how Markus or Evans received better treatment by UPS than she did.

Despite similarities between McKinley, Evans, and Markus there are significant distinctions. Markus—classified at a different designation, reporting to a different manager, and supervising different employees—is not similarly situated to McKinley and the evidence presented does not dispute this.  *Id.*; *see Sweatt v. Union Pac. R. Co*., 796 F.3d 701, 709 (7th Cir. 2015) (finding plaintiff failed to establish comparators who were similarly situated). Regarding Evans, a review of the UPS Operation Reports supports UPS's contention that the Twilight Sort was the heaviest in terms of volume. The Twilight Sort was characterized as "much more stressful" and having a "higher volume" than the Day Sort (Filing No. 51-3 at 18).  Evans working on the "heaviest" shift at the 81st Street Facility distinguishes him from McKinley.  The record shows that McKinley was offered a Specialist position on the same shift as Evans and she declined the offer (Filing No. 51-1 at 69–70; Filing No. 51-4 at 15); *see Coleman v. Donahoe,* 667 F.3d 835, 847 (7th Cir. 2012) ("There must be 'enough common factors ... to allow for a meaningful comparison in order to divine whether intentional discrimination was at play.'") (quoting *Barricks v. Eli Lilly and Co*., 481 F.3d 556, 560 (7th Cir. 2007)).

The Court finds that McKinley has not presented evidence that would permit a jury to find that Markus and Evans were treated better than she was and that they were similarly situated in all

material respects.  *See Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008) (finding that despite similarly situated inquiry being flexible the court nevertheless requires the inquiry examine whether there are sufficient commonalities on key variables between plaintiff and would-be comparators to allow the type of comparison that, taken together with other *prima facie* evidence, would allow a jury to reach an inference of discrimination).

McKinley has not presented sufficient evidence to establish her claim of discrimination under Title VII through the direct method or through circumstantial evidence. *See Harper*, 748 F.3d. at 767 ("And even if the testimony had some circumstantial relevance, the totality of [plaintiff's] evidence is simply insufficient to establish intentional sex discrimination.").

### 3.   Indirect method

When analyzing failure to promote claims, the *McDonnell Douglas* framework requires that the plaintiff demonstrate that "(1) [she] was a member of a protected class; (2) that [s]he was qualified for the position; (3) that [s]he was rejected for the position; and (4) that the position was given to a person outside the protected class who was similarly or less qualified than [her]." *Stockwell v. City of Harvey*, 597 F.3d 895, 901 (7th Cir. 2010).  Should the plaintiff meet all the elements of their *prima facie* case, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual."  *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quoting *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 720 (7th Cir. 2018)).

McKinley satisfies the first and second prongs of the analysis, however, she cannot establish the third or fourth prong and thus fails the inquiry for two reasons.  First, between October 24, 2017 and August 28, 2018, there were two Full-Time Specialist positions on the Day Sort—

one at the 81st Street Facility and one at the Plainfield Facility (Filing No. 53 at 12). It is undisputed that UPS made offers of both positions to McKinley. *Id.* She rejected the offer to be a Specialist at the Plainfield Facility because she wanted to be a Specialist at the 81st Street Facility (Filing No. 51-1 at 66). UPS then transferred Bryant to the Full-Time Specialist position at the Plainfield Facility which created a vacancy for a Full-Time Specialist position at the 81st Street Facility which went to McKinley. *Id.* at 67. McKinley is unable to show that she was rejected for the Specialist position she sought between October 24, 2017 and August 28, 2018. *See Riley,* 829 F.3d at 892 ("Because [plaintiff] failed to produce evidence that she was rejected for the positions, she cannot establish a *prima facie* case; the claims fail as a matter of law.").

Second, McKinley fails the third prong of the inquiry is because she designates no evidence that she directly applied for a Specialist position and was rejected. *See Jaburek v. Foxx*, 813 F.3d 626, 631 (7th Cir. 2016) (quoting *Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 728 (7th Cir. 2013) (holding that failure to promote claim requires that plaintiff "appl[y] for . . . the position sought" and granting summary judgment on Title VII failure to promote claim where plaintiff did not apply for higher position (quotation marks and citations omitted))). McKinley does not provide evidence that she ever submitted an application or materials to be part of the promotion process for a specific Specialist position and was subsequently rejected for that position. *See Jaburek*, 813 F.3d at 632 ("Even viewing the evidence in the light most favorable to Appellant, there is no evidence that she actually applied for the position of Program Analyst. Having not applied for the position, she could not have been rejected for the position."); *see also Hudson v. Chicago Transit Authority,* 375 F.3d 552, 558–59 (7th Cir. 2004) (affirming summary judgment for employer where employee did not apply for the position at issue); *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir.2003) (holding that a

plaintiff in a failure to promote context must show that they applied for and were rejected for the promotion to establish an adverse action). Moreover, McKinley fails the fourth prong because she has not shown that any of the potential comparators she identifies—Markus, Evans, McAdow, Bowers, and Wells—were promoted to the Specialist position she sought or was rejected for. *See Ford*, 942 F.3d at 858 ("But none of these individuals competed for the specific promotions that [plaintiff] sought").

McKinley has not made a *prima facie* case for a failure to promote claim under Title VII. *See Atanus v. Perry*, 520 F.3d 662, 673 (7th Cir. 2008) (finding summary judgment for the employer appropriate if employee fails to establish any elements of a *prima facie* case for failure to promote).  In viewing the evidence presented as a whole and providing all reasonable inferences to McKinley as the non-moving party, the Court finds no genuine issues of material facts in dispute and thus **grants** summary judgment for UPS on McKinley's Title VII discrimination.

## C.   Title VII Hostile Work Environment Claim

Unlike "discrete acts" in the context of Title VII discrimination claims, a "hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice." *Morgan*, 536 U.S. at 117 (internal citations and quotation marks omitted). The Supreme Court holds that "[h]ostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct." *Id*. at 115 (citations omitted).  An employee need only file an EEOC charge within 300 days of the last hostile act in a continuous and ongoing hostile work environment. *Moore*, 641 F.3d at 256 (citing 536 U.S. at 117–18) *see also Pruitt v. City of Chicago*, 472 F.3d 925, 927 (7th Cir. 2006). "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII

is violated." *Morgan*, 536 U.S. at 116 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).

UPS first asserts the statute of limitations precludes consideration of alleged incidents of harassment that occurred prior to the 300-day timeframe before McKinley's EEOC Charge was filed because those events are not related to the alleged conduct which occurred during the applicable limitations period (Filing No. 53 at 13). UPS argues the "continuing violations doctrine does not save McKinley's time-barred hostile work environment claim," because the incidents alleged are "sporadic and isolated" and allegedly occurred before October 24, 2017, thus not constituting a "single, ongoing unlawful employment practice." *Id*; *see Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992) ("The continuing violation doctrine allows a plaintiff to get relief for a time-barred act by linking it with an act that is within the limitations period. For purposes of the limitations period, courts treat such a combination as one continuous act that ends within the limitations period.").

The conduct alleged by McKinley to have occurred outside the limitations period includes an "unwelcome kiss by a feeder driver" that occurred several years before 2015, an "inappropriate touching by a manager at a retirement party" in 2015, a comment by a manager in 1994 that McKinley "chose family over a career," and a coworker's comment in 2013 that McKinley "was a typical female who did not listen." (Filing No. 53 at 15). UPS argues that none of these individuals "were involved in conduct which McKinley alleges occurred within the applicable statute of limitations period" and each alleged incident "were long complete before McKinley filed her charge of discrimination." *Id*. UPS maintains that because McKinley "did not sue at any of those points her allegations of harassment that occurred prior to October 24, 2017, are barred from consideration." *Id.* at 16.

24

UPS further asserts the incidents of alleged harassment "properly" before the Court "are not severe or pervasive enough to satisfy the hostile work environment standard" and McKinley did not "experience sufficiently severe or pervasive conduct." *Id*. at 16–17. The comments on which McKinley's harassment claims are based "do not transform McKinley's work environment into an actionable one." *Id*. at 17. And the alleged conduct "did not alter the conditions of McKinley's working environment" given that she "performed her job well," "received positive feedback" and received "merit based pay increases." *Id*. at 18. UPS maintains that it cannot be held liable for the multiple alleged incidents of harassment that McKinley never reported and such failure to report is "fatal to her hostile work environment claim." *Id*. at 19.

McKinley responds that a reasonable jury could find that she was harassed on the basis of sex. (Filing No. 57 at 29.) She found her work environment "offensive," and this is supported by her "complaints to HR and her three reports" to the UPS Help Line. *Id*. at 30. McKinley argues that a reasonable jury could find that she was "subjected to severe or pervasive harassment" and, in the wake of the #MeToo Movement, the "norm cascade around sexual harassment" would be relevant to a jury to find an actionable hostile work environment. *Id*. at 31. She asserts that the totality of evidence—a former manager grabbing her body inappropriately without consent, being given an unwanted kiss by a feeder driver, having a radio and phone receiver thrown by a manager and making contact, constant comments about her body, "nasty comments" by a male coworker about her daughter, and the alleged viewing of nude pictures by male coworkers in her workspace—could lead a reasonable jury to conclude that she was subjected to severe or pervasive harassment because of her sex. *Id*. at 32.

McKinley argues that UPS is strictly liable for her harassment and she has presented evidence that she was subjected to tangible employment actions—not being designated a

Specialist, being excluded from overtime work, and having her "April 2019 raise downgraded"—which makes the *Faragher/Ellerth* affirmative defense unavailable to UPS. *Id.* at 32–33; *see Pennsylvania State Police v. Suders*, 542 U.S. 129, 143 (2004) (framework governing employer liability for sexual harassment by supervisors that delineate two categories of hostile work environment claims: (1) harassment culminating in tangible employment action, for which employers are strictly liable and (2) harassment that takes place in absence of tangible employment action, to which employers may assert an affirmative defense). And even if the *Faragher/Ellerth* affirmative defense was available to UPS, it has not met its burden in proving that it exercised reasonable care to prevent further harassment or that McKinley unreasonably failed to take advantage of corrective opportunities. *Id.* at 33.

In reply, UPS contends that McKinley's remaining allegations consist of evidence that is a "vague array of objectionable comments and other conduct" that do not meet the standard of severe or pervasive harassment to "sustain [her] Title VII cause of action." *Id.* at 12. These remaining allegations include (1) an incident from 2015 or 2016 of several male supervisors and managers speaking over her during a workplace discussion; (2) unidentified UPS employees making comments about her body and other women at least two to three times a week; (3) male employees gathering around to allegedly look at nude images of women on phones; and (4) a 2018 claim that a male employee became upset with her and mockingly told her, "And you should know that Ms. 30 years." *Id.* Only one claim by McKinley—the 2018 comment from a male coworker who referred to her as "Ms. 30 years"—could be established as timely. *Id.*

UPS maintains McKinley provides no evidence of the substance of other alleged "daily comments", when they were made, or who uttered them and McKinley does not provide evidence of "their frequency, that she felt threatened, or that it interfered with her work performance." *Id.*

(citing *Lambert v. Peri Formworks Sys., Inc.*, 73 F.3d 863, 868 (7th Cir. 2013)). UPS concludes that McKinley has not met this Court's standard for severe or pervasive harassment and summary judgment should be granted regarding her harassment claim.  *Id*. at 13.

In determining whether a hostile environment claim is actionable under Title VII, the court must "look to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Morgan*, 536 U.S. at 116 (citing *Harris,* 510 U.S. at 23).

The Court disagrees that McKinley's hostile work claim is time-barred.  A hostile-work-environment charge is timely as long as '*any* act falls within the statutory time period,' even if the charge encompasses events occurring prior to the statutory time period. *Adams*, 742 F.3d 720, 730 (7th Cir. 2014) (citations omitted) (emphasis in original). In her EEOC Charge, McKinley alleged "daily harassment, intimidation, and belittling on account of [her] sex," described "daily sexual innuendo" and "degrading" comments about women and their physical appearances, and detailed specific instances of such conduct occurring in 1994 and 2013 (Filing No. 56-10). McKinley presented evidence that managers, supervisors, and coworkers made inappropriate and sexist comments along with instances of inappropriate touching (*see* Filing No. 57 at 2, 5–8, 12–13). And McKinley references the 2018 incident of being mocked by a superior as "Ms. 30 years." *Id*. Despite many of these acts occurring outside the 300-day filing period, it cannot be said that they are not part of the same hostile work environment claim that McKinley is raising: that she was subjected to daily harassment and degrading comments. *See Morgan*, 536 U.S. at 103.

Establishing that her hostile environment claim is timely, the Court turns to whether McKinley has met the standard for an actionable claim.  "An actionable hostile environment claim

requires the plaintiff to prove: (1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability." *Alexander v. Casino Queen, Inc*., 739 F.3d 972, 982 (7th Cir. 2014) (citations omitted).

Although McKinley's allegations are serious, t she has not met the standard for an actionable claim and cannot demonstrate that the offenses alleged occurred with sufficient frequency, she was subjected to "severe or pervasive harassment that altered the conditions of her employment," and that the alleged offenses unreasonably interfered with her work performance and created an "abusive working environment." *Morgan*, 536 U.S. at 116.

The Court assumes that McKinley's work environment was subjectively offensive, however, she has not shown evidence that it was "objectively offensive." *Alexander*, 739 F.3d at 982. Her work environment was not "physically threatening," nor was it openly and continually sexist, "nor did it unreasonably interfere with [her] performance." *Id*. at 982; *see Gentry v. Export Packaging Co*., 238 F.3d 842, 851 (7th Cir. 2001) (holding it was reasonable for the jury to find a hostile work environment where, due to her immediate supervisor's alleged sexual harassment, the plaintiff "found it hard to concentrate on her work," hated her job, "often cried when she went to work," and "was treated for anxiety and depression").

McKinley admits that her allegations of male employees leering around a shared phone making comments "didn't happen every day," and she "did not see it myself." (Filing No. 51-1 at 144.) McKinley assumed the rude comment about "Ms. 30 years" was done because she was a woman but does not present evidence of an actual discriminatory basis. *Id*. at 119The alleged "daily harassment" was "said in a joking manner" though she "made [it] known" that she did not like it." *Id*. at 123. However, McKinley admits that the person who made the most such comments

was a male employee she considered "a friend" and she would at times laugh at those same jokes. *Id.* at 125-126.

McKinley admits to engaging in banter with male colleagues who made disparaging comments about other women by retorting that "they were no prize." *Id*. at 128. Her situation improved regarding the disparaging comments because she would "call them out on it." *Id*. She gave the male employee who said "nasty things" about her daughter a "very severe thrashing," and he did not make any further comments. *Id*. at 147. Regarding her claims of unwanted physical contact which occurred over a period of several years—a former manager grabbing her body inappropriately without consent, being given an unwanted kiss by a feeder driver, having a radio and phone receiver thrown by a manager and making contact—the Court finds these acts occurred as isolated incidents that do not amount to severe or pervasive harassment or discriminatory changes in the "terms and conditions of employment." *Doyle v. Am. Elec. Power Co*., No. 413-CV-00037-SEB-DML, 2015 WL 1505649, at *11 (S.D. Ind. Mar. 31, 2015) ("Thus, 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.') (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

The Court considers McKinley's hostile work environment claim under a "totality of the circumstances" approach and finds she has not provided sufficient evidence to meet the standard for an actionable claim of hostile work environment. *See Boss*, 816 F.3d at 920 ("The evidence does not suffice to show a workplace permeated with discriminatory ridicule, intimidation, and insult, or one where Boss' supervisors acted against him for any prohibited reason.").

Accordingly, the Court **grants** summary judgment for UPS on McKinley's Title VII hostile work environment claim.

D.    **EPA Claim**

The EPA prohibits employers from discriminating between its employees by paying an employee lower wages than the employer pays an employee of the opposite sex. 29 U.S.C. § 206(d)(1). The limitations period is two years and is extended to three years for willful violations. *Id*.  UPS asserts that McKinley's EPA claim "actually concerns a 'failure to promote'" that is untimely because McKinley is essentially arguing that she should have been promoted in 2013 (Filing No. 53 at 20.) The Court disagrees. McKinley filed this lawsuit on June 24, 2019 and "alleged willful violations of the Equal Pay Act." (Filing No. 57 at 19.) McKinley correctly asserts that "any violations from the period of June 24, 2016" through "June 24, 2019" are timely, and even if "UPS' actions were not willful violations, any violations from…June 24, 2017" through "June 24, 2019 are timely." *Id*.  McKinley makes clear that her argument is centered on performing work that was substantially equal to work performed by male employees under the same conditions despite those male employees being paid more in violation of the EPA (Filing No. 1 at 5).

McKinley does argue that UPS failed to promote her to Specialist between June 24, 2016 through March 12, 2018, but she also alleges being paid less than males for substantially the same work from June 24, 2016 through June 24, 2019 (Filing No. 57 at 20). She asserts that she made a call to the UPS Help Line in 2018 "to report pay discrimination in differential access to overtime on account of sex." *Id*. And she argues that her raise was downgraded in April 2019 and that she "continues to this day to receive less compensation on account of her sex." *Id*. Thus, her disparate-pay claim under the EPA is not time-barred.

An employee establishes a *prima facie* claim under the [EPA] by demonstrating a difference in pay despite having a job that requires 'equal skill, effort, and responsibility' as the comparator and a job that is performed under similar working conditions to the comparator. *Terry*

*v. Gary Cmty. Sch. Corp.*, 910 F.3d 1000, 1008 (7th Cir. 2018) (citing *Lauderdale v. Ill. Dep't of Human Servs.*, 876 F.3d 904, 907 (7th Cir. 2017); *see also King v. Acosta Sales & Mktg., Inc.*, 678 F.3d 470, 474 (7th Cir. 2012). If an employee can make this showing, the burden of proof then shifts to her employer to prove there was some "neutral factor that explains the discrepancy in salary." *Lauderdale*, 876 F.3d at 907. The EPA establishes four affirmative defenses available to employers to claim the discrepancy is not discriminatory: " where . . . payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." *Id.* (citing 29 U.S.C. § 206(d)(1)).

If not time-barred, UPS contends that McKinley's EPA claim fails because it compensated her according to the pay band for the position she held (Filing No. 53 at 22). UPS compensated McKinley within the pay band for Part-Time Supervisors until her 2018 promotion to Specialist where she was then paid in line with other Specialists. UPS asserts that even if McKinley could make her initial showing under the *prima facie* inquiry, it is entitled to summary judgment because it has demonstrated a neutral factor "other than sex" that explains the discrepancy: it was paying McKinley according to the UPS pay band for the positions she held. *Id.* at 24. UPS contends that in the "Seventh Circuit, prior wages are a valid factor other than sex justifying a pay disparity." *Id.* at 23 (internal citations and quotation marks omitted).

McKinley responds that a reasonable jury could find that she (1) did work that was substantially equal in skill, effort, and responsibility to male employees at UPS; (2) she and the other male employees did their jobs under similar working conditions; and (3) UPS compensated her less than male employees doing substantially equal work (Filing No. 57 at 21–22). It is apparent that the work McKinley performed was sufficiently equal to male employees working in

the Control Tower, the working conditions were similar, and there is evidence presented that she was paid less than male employees doing substantially equal work. *Id.* The Court finds that the evidence in record supports that McKinley has established her initial burden for a *prima facie* claim under the EPA.

Having satisfied her initial requirement, the burden of proof shifts UPS to provide a neutral factor, other than sex, that explains the discrepancy in pay between McKinley and Markus and Evans—the comparators she identifies. *See Terry*, 910 F.3d at 1009 (summary judgment affirmed for defendant-employer arguing that plaintiff could not prove discrimination under EPA because defendant-employer "had pay scale for its employees" and plaintiff was "at the high end of the pay scale" even though "she was not at the very top").

McKinley asserts she has provided sufficient evidence to cast doubt on UPS alleged justification for paying her less than her male counterparts. (Filing No. 57 at 23). McKinley claims the justification that UPS provides for paying her less than male colleagues was because of her prior wages. *Id.* at 24. She notes the Seventh Circuit has held that "basing pay on prior wages could be discriminatory if sex discrimination led to the lower prior wages." *Id.* at 24 (citing *Kellogg*, 984 F.3d at 529). She argues that the sexist comment made by a former manager in 1994 that McKinley "chose a family over a career" and the fact that she was not promoted to Specialist for eighteen years while ostensibly doing the same work is evidence of UPS's dishonest justification for their disparate treatment. *Id.* UPS replies that McKinley was compensated consistent with how UPS compensated male employees and "has provided no evidence to contest the honesty of UPS's stated reason" that it was "paying her, and the male Specialists, according to their band." (Filing No. 53 at 6–7.)

The designated evidence does not establish that the reasons given by UPS for the differential treatment of McKinley in pay and designation were dishonest and McKinley's assertions are conclusory allegations that do not dispute UPS's stated justifications. *See Igasaki*, 988 F.3d at 958 (finding that plaintiff did not offer evidence of dishonesty in sex discrimination claim); *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010) ("[M]ere conclusory allegations do not constitute evidence.").

"An employer's given explanation for a pay discrepancy must be supported by evidence that the employer actually relied on that reason." *Lauderdale*, 876 F.3d at 908 (citations omitted). The evidence submitted by UPS supports that it closely followed its pay band structure to determine compensation for its employment positions. The record reflects that McKinley was given raises in-line with the UPS pay band for Part-Time Supervisors and that upon being promoted to a Specialist, her hourly pay rate increased to be consistent with the Specialist pay band (Filing No. 51-2 at 3–4). As noted in our analysis of her Title VII claim, McKinley admitted that the UPS pay bands corresponded with an employee's title and pay rate (Filing No. 51-1 at 40–41). The evidence presented shows that UPS paid McKinley at the top of the pay band for her position before she was promoted to a Specialist. *Id.*; (Filing No. 51-9 at 9). McKinley does not dispute that she is now paid more than two male Specialists following her post-promotion pay increases (Filing No. 51-2 at 4). McKinley has not provided sufficient evidence to show that her past wages were a result of sex discrimination.

Accordingly, the existence of a pay discrepancy between McKinley and her comparators is explained by the legitimate "neutral factor" offered by UPS: McKinley was paid according to the pay band of her current and prior positions. *See Lauderdale*, 876 F.3d at 908 ("[T]his court has repeatedly held that a difference in pay based on the difference in what employees were previously

33

paid is a legitimate 'factor other than sex.'"); *see also Wernsing v. Dep't of Human Servs.*, 427 F.3d 466, 468 (7th Cir. 2005) (citing *Dey v. Colt Constr. & Dev't Co.*, 28 F.3d 1446 (7th Cir. 1994), *Riordan v. Kempiners*, 831 F.2d 690 (7th Cir. 1987), and *Covington v. S. Ill. Univ.*, 816 F.2d 317 (7th Cir. 1987)).

The Court finds that McKinley has not raised a triable issue regarding whether UPS paid her less wages because of her sex in violation of the EPA and summary judgment is warranted on McKinley's EPA claim.

## IV.    CONCLUSION

For the reasons discussed above, the Court **GRANTS** UPS's Motion for Summary Judgment (Filing No. 52). The final pretrial conference and jury trial dates are **VACATED** and this action is closed. The Court will enter Final Judgment by separate order.

**SO ORDERED.**

Date:  9/30/2021

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Quincy Erica Sauer
MACEY SWANSON & ALLMAN
qsauer@maceylaw.com

Brian Lee Mosby
LITTLER MENDELSON, P.C.
bmosby@littler.com

Peter T. Tschanz
LITTLER MENDELSON, P.C. (Indianapolis)
ptschanz@littler.com